FILED
02/23/2024
Clerk of the
Appellate Courts

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT JACKSON
### January 3, 2024 Session

## STATE OF TENNESSEE v. TRAVIS HAYNES

**Appeal from the Criminal Court for Shelby County**
**No. C1901995 / 19 01494  James M. Lammey, Judge**

_____

## No. W2022-01573-CCA-R3-CD
_____

A Shelby County jury convicted the defendant, Travis Haynes, of first-degree murder, tampering with evidence, and convicted felon in possession of a firearm, for which he received an effective sentence of life imprisonment plus twenty years.  On appeal, the defendant contends the evidence presented at trial was insufficient to support his convictions for first-degree murder and tampering with evidence.  The defendant also argues the trial court erred in not allowing the introduction of autopsy photographs through Ms. Dinkins, in failing to include an instruction on voluntary manslaughter, and in denying the defendant's motion to continue.  After reviewing the record and considering the applicable law, we affirm the judgments of the trial court.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, and MATTHEW J. WILSON, JJ., joined.

Shae Atkinson and Terrell Tooten (on appeal), and John Dolan and Shaun Schielke (at trial), Memphis, Tennessee, for the appellant, Travis Haynes.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Steve Mulroy, District Attorney General; and Paul Hagerman and Paige Munn, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### *Facts and Procedural History*

At approximately 2:00 a.m. on December 10, 2018, Tina Dinkins and the defendant, her fiancé, arrived at the Garden Inn at the corner of American Way and Lamar in Memphis where Ms. Dinkins was living with her children. Ms. Dinkins and the defendant were at a nightclub earlier in the evening, but Ms. Dinkins told the defendant they needed to leave because the defendant was too intoxicated. When they arrived at the hotel, Ms. Dinkins attempted to get the defendant into her room. However, the defendant stayed in the parking lot near his car, stating that he was hot, that he would "kill any n****r that moves," that he would "shoot a couple rounds," and that he had already killed two police officers in his lifetime. A short time later, a woman and two men began walking from their car toward the hotel's entrance. Although the defendant did not know them, he walked quickly toward the group and "bumped" into the victim, Jeremy Robinson. Ms. Dinkins tried to defuse the situation by telling the victim that the defendant was drunk. According to Ms. Dinkins, the victim did not threaten the defendant nor did she see the victim with a gun. Ms. Dinkins and the defendant then walked into the hotel. Initially, the defendant began walking down the hallway toward Ms. Dinkins' room; however, he suddenly turned around and sat down in a chair in the lobby. When Ms. Dinkins approached the defendant to lead him to her room, he violently pushed her away. The victim and his friends entered the lobby a few seconds later, and the defendant approached the victim, shooting him nine times at point-blank range before exiting the hotel through the front door. Jitendra Patel, the owner of the Garden Inn, heard the shots from the hotel's office and called 911.

Sergeant Cecil Fowler with the Memphis Police Department ("MPD") responded to a shots fired call at the hotel and observed the deceased victim on the floor of the lobby. Sergeant Fowler spoke with Mr. Patel and discovered that surveillance cameras had captured the shooting. After reviewing the surveillance footage, Sergeant Fowler broadcast a description of the defendant and his vehicle for officers in the immediate area.

Officer Alexander Fleites with the MPD was notified to be on the look out for a red Mitsubishi sedan. At 3:24 a.m., Officer Fleites located an unoccupied vehicle matching that description with two flat tires parked on the side of American Way near Clearbrook.

Officer Fredrick Reading with the MPD also responded to the hotel and reviewed the surveillance video footage of the shooting. A short time later, Officer Reading was notified that the defendant's vehicle was located approximately two miles from the hotel, and after driving to that location, Officer Reading located the defendant walking approximately fifty feet from his vehicle.[1] The defendant did not have any weapons on him at the time of his arrest.

---

[1] Officer Reading later testified that the defendant was fifteen feet from his vehicle.

Officer Tristan Brown with the MPD Crime Scene Investigation Unit processed the scene, photographing and collecting all evidence. In particular, Officer Brown collected seven .40 caliber casings, bullet fragments, and spent projectiles.

Lieutenant Michael Coburn with the MPD Crime Scene Investigation Unit processed the defendant's vehicle and recovered a Smith and Wesson chrome magazine on the right front floorboard with six .40 caliber rounds. Lieutenant Coburn testified that the magazine originally held fourteen rounds.

Dr. Marco Ross, an expert in forensic pathology and the chief medical examiner at the West Tennessee Regional Forensic Center, testified that the victim's autopsy was performed by Dr. Paul Benson, who is no longer with their office. However, Dr. Ross reviewed the record, photographs, and report from the victim's autopsy and agreed with Dr. Benson's conclusions. Dr. Ross found that the victim suffered nine gunshot wounds. The first bullet entered on the left side of the victim's neck and went through muscular tissue before exiting on the back of the neck. The second gunshot wound was to left front part of the victim's chest. The bullet travelled through both lungs and the aorta before becoming lodged in the victim's right upper back. The third bullet entered the left side of the victim's back and went through muscle before lodging next to his spine. The fourth gunshot wound was to the victim's left torso. The bullet travelled through the victim's left kidney, pancreas, liver, and right lung before lodging in his right chest cavity. The fifth bullet entered the victim's left pelvic region. The next two bullets entered the back of the victim's left thigh. These bullets fractured the victim's femur, leaving bullet fragments in the victim's leg. The eighth gunshot wound was to the back of the victim's right thigh. The bullet went through the thigh and exited the front of the leg. The ninth bullet entered the victim's left lower leg, where it went through muscular tissue before exiting the leg. Dr. Ross noted that both the bullet that went through the victim's aorta as well as the bullet that travelled through multiple organs could have been lethal. Dr. Ross testified that a toxicology report revealed the presence of methamphetamine and amphetamine, a breakdown product of methamphetamine. On cross-examination, Dr. Ross testified that the toxicology report did not indicate the level of methamphetamine in the victim's blood, but he agreed that individuals with methamphetamine levels present may "express irritability, violent behavior, [and] aggressiveness."

On cross-examination, Ms. Dinkins testified that in addition to alcohol, the defendant may have also been intoxicated due to taking a Percocet. She stated that she had never seen the defendant intoxicated before and that he did not normally drink to excess. Additionally, the defendant was especially emotional that night, in part because his brother-in-law had been killed two days prior. On redirect examination, Ms. Dinkins conceded that the surveillance video showed the defendant tackling her in the parking lot prior to the defendant bumping into the victim. However, she stated that it was an accident because

she had the defendant's phone, and they slipped in some water. On recross-examination, Ms. Dinkins testified that she heard the victim and his friend talking in the foyer as she was passing them. The victim asked his friend if he "got that strap." On further redirect, Ms. Dinkins admitted that the defendant did not hear the victim make this statement. She further admitted that she did not see either man with a weapon and that they did not threaten her or the defendant. She also agreed that she was still engaged to the defendant and that she was trying to help him.

A stipulation of fact was entered into proof which stated the following:

The defendant, Travis Haynes, was previously convicted of a qualifying felony offense that prohibits him from possessing a firearm. That conviction occurred on January 16, 2007, in Division 4 of Criminal Court of Shelby County, Tennessee under docket number 06-07930.

Therefore, on December 10th of 2018, when this case happened, the defendant was a convicted felon. The defendant hereby waives any jury determination of this issue and agrees that this fact that he was a convicted felon prohibiting him to possess a firearm has been proven beyond a reasonable doubt.

The defendant declined to present evidence. Following deliberations, the jury found the defendant guilty of first-degree murder, tampering with evidence, and convicted felon in possession of a firearm, and the trial court imposed an effective sentence of life imprisonment plus twenty years. The defendant filed a motion for new trial which the trial court denied. This timely appeal followed.

### *Analysis*

On appeal, the defendant contends the evidence presented at trial was insufficient to support his convictions for first-degree murder and tampering with evidence.[2] The defendant also argues the trial court erred in denying a motion for continuance to allow the defendant to obtain an in-person psychological evaluation, in not allowing the introduction of autopsy photographs through Ms. Dinkins, and in failing to include an instruction on voluntary manslaughter. The State contends that the evidence is sufficient and that the trial court properly determined an instruction on voluntary manslaughter was not supported by the evidence. The State also contends that any review of the trial court's ruling on the victim's autopsy photographs and denial of the defendant's motion to continue has been waived.

---

[2] The defendant does not challenge his conviction for convicted felon in possession of a firearm.

## I.      Denial of Motion to Continue[3]

The defendant asserts the trial court erred when denying his motion for a trial continuance in order to obtain an in-person competency evaluation. The defendant argues that the evaluation he received via videoconferencing was insufficient given his "prior mental health diagnoses and traumatic life experiences." The State contends the defendant has waived this issue for failing to include the challenged psychological evaluation report in the appellate record. The State further contends the trial court acted within its discretion to deny the defendant's request for a second evaluation and continuance. Despite the State's contention, the appellate record contains the evaluation report, and therefore, we will review the defendant's claim on the merits.[4]

The decision to grant a trial continuance lies within the sound discretion of the trial court. *State v. Russell*, 10 S.W.3d 270, 275 (Tenn. Crim. App. 1999). The trial court's denial of a motion for continuance will only be overturned where the trial court abused its discretion, and the denial resulted in prejudice to the defendant. *State v. Thomas*, 158 S.W. 3d 361, 392 (Tenn. 2005). "An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied [the] defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted." *Id*. (internal citations omitted).

On July 7, 2022, the defendant filed a motion in limine, arguing his due process rights had been violated when he was forced to participate in a psychological examination via videoconferencing. Although necessary due to the ongoing Covid-19 pandemic, the defendant argued that this examination limited the examiner from assessing the defendant's "non-verbal expressions, communication, or reaction in sufficient detail."

During a pretrial hearing, the defendant requested a continuance to allow an additional in-person evaluation. The trial court denied the request, stating the defendant would need to show that the initial evaluator "couldn't really assess [the defendant] well because of Zoom and [could not] really render any type of opinion or [determined,] well if we had an in-person contact, we might have a better assessment." However, as defense counsel noted, the report from West Tennessee Forensic Services found that the defendant

---

[3] For the sake of clarity, we have reordered and renumbered the issues from the order they appear in the defendant's brief.

[4] Although the defendant filed a motion to supplement the record with the report from his mental health evaluation, the supplement contained only the order directing a forensic evaluation and a letter from West Tennessee Forensic Services summarizing the defendant's evaluation. Nevertheless, the record filed in this appeal contained the report from the defendant's mental health evaluation as an exhibit to his notice of mitigating factors.

was "competent to proceed with the disposition of the charges." Additionally, despite the defendant's assertion that the evaluator was unable to accurately assess the defendant's non-verbal expressions or reactions in sufficient detail, the report noted that the defendant's

> speech volume, quantity, rate, and clarity were all within normal range. His speech quality was fluent. His eye contact was appropriate. His motor activity was within normal range. His affect was congruent with his mood (sad and depressed). He presented as tearful when appropriate. His emotional range and stability were normal. His coordination and gait could not be observed through video. His thought process and thought content were logical. He was oriented to person, place, time, and situation. He was attentive throughout the interview. His remote, recent, and immediate memory were all intact. He was an accurate historian and provided adequate details. He was of average intellectual functioning. He demonstrated fair insight and his judgement appeared intact.

The defendant has failed to demonstrate that the trial court abused its discretion by denying his motion to continue. Although the defendant suggests an in-person evaluation might have allowed an examiner to observe him more closely, it is clear that he received a thorough evaluation and that he has failed to establish "that the defendant might have been prejudiced in some way by the refusal to grant a continuance." *Moorehead v. State*, 409 S.W.2d 357, 358 (Tenn. 1966). Accordingly, the defendant is not entitled to relief on this issue.

## II.    Autopsy Photographs

The defendant argues the trial court erred in failing to allow defense counsel to introduce several photographs from the victim's autopsy through Ms. Dinkins. The defendant argues the photographs, which the defendant claims depict a tattoo of the word "Trigga" on the victim's neck, would "show that [the victim] had an impulsive, explicit, aggressive, and provocative nature." The State contends the defendant has waived this issue for failing to include the challenged photographs in the appellate record. The State further contends the record supports the trial court's refusal to admit the photographs because they could not be authenticated by Ms. Dinkins.

During Ms. Dinkins' testimony, defense counsel attempted to introduce several photographs from the victim's autopsy. The prosecutor objected, and the trial court sustained the objection, stating that it "would be inappropriate to show this witness the autopsy photos of this victim." Although the trial court noted that defense counsel could recall the medical examiner if he wanted to introduce the photographs, defense counsel declined to do so.

On appeal, the State argues the defendant has waived this issue by failing to include the photographs he wished to introduce in the appellate record, and we agree. The defendant, as the appellant, has a duty to prepare a record that conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). "In the absence of an adequate record on appeal, we must presume that the trial court's ruling was supported by the evidence." *State v. Bibbs*, 806 S.W.2d 786, 790 (Tenn. Crim. App. 1991) (first citing *Smith v. State*, 584 S.W.2d 811, 812 (Tenn. Crim. App. 1979); and then citing *Vermilye v. State*, 584 S.W.2d 226, 230 (Tenn. Crim. App. 1979)). Although the State raised the issue of the inadequate appellate record in its brief, the defendant did not file a motion to supplement. Accordingly, the defendant has waived this issue and is not entitled to relief.

## III.  Sufficiency

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the following rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere, and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted

defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

## A.      First-Degree Premeditated Murder

The defendant was convicted of one count of first-degree premeditated murder. First-degree murder is "a premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). In this context, premeditation is "an act done after the exercise of reflection and judgment." *Id.* § 39-13-202(d). Tennessee Code Annotated section 39-13-202(d) further states:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* "The element of premeditation is a question for the jury which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006) (citing *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997)). The Tennessee Supreme Court has identified certain factors which tend to support a finding of premeditation, including: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660 (first citing *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992); and then citing *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992)). *Bland* does not include an exhaustive list of factors for consideration when finding premeditation. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). A conclusion the killing was premeditated may also be supported by the nature of the killing or evidence establishing a motive. *Id.* Likewise, lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *State v. Larkin*, 443 S.W.3d 751, 815-16 (Tenn. Crim. App. 2013) (internal citations omitted).

Here, the defendant does not dispute that he shot the victim. Instead, the defendant argues the State failed to establish that he acted with premeditation. Specifically, the defendant contends "there was [not] enough time between the bump outside the hotel, the pushing inside the hotel, and the exchange of words for the passion to subside." Additionally, the defendant argues that Ms. Dinkins testified that the defendant had taken a Percocet that night and was too intoxicated to drive home, and therefore, he did not have

the ability to form the intent of premeditation.  The State contends the evidence was sufficient to support the jury's determination, and we agree.

In the light most favorable to the State, the evidence shows that the defendant arrived at the hotel parking lot with Ms. Dinkins and refused to go inside, telling her that he would "kill any n****r that moves," that he would "shoot a couple rounds," and that he had previously killed two police officers.  When the victim began walking from his car toward the hotel's entrance, the defendant, who did not know the victim, "bumped" into him.  Ms. Dinkins testified that the victim did not threaten the defendant prior to the defendant bumping into him nor did she see the victim with a gun.  Although the defendant began walking down the hallway toward Ms. Dinkins' room, he immediately turned around and sat down in a chair in the lobby.  When the victim entered the lobby, the defendant approached the victim and shot him nine times at point-blank range before exiting the hotel through the front door.

Looking specifically to the premeditation factors outlined by our supreme court, the record establishes the defendant waited for the unarmed victim in the hotel lobby after briefly considering returning to his hotel room.  The defendant shot the victim nine times, including two fatal gunshot wounds.  Afterward, he did not attempt to render aid to the victim, choosing instead to exit the hotel and dispose of the gun.  *See Bland*, 958 S.W.2d at 660; *Larkin* 443 S.W.3d 815-6.  Accordingly, the record is sufficient to establish premeditation so as to sustain a conviction for first-degree murder.

The defendant also argues that he was "too intoxicated to form premeditation."  "Intoxication itself is not a defense to prosecution for an offense.  However, intoxication, whether voluntary or involuntary, is admissible in evidence, if it is relevant to negate a culpable mental state."  Tenn. Code Ann. § 39-11-503.  "[T]he weight to be given the evidence and the determination of whether the voluntary intoxication negate[s] the culpable mental elements [are] matters for the jury."  *State v. Morris*, 24 S.W.3d 788, 796 (Tenn. 2000).  The jury heard and, by its verdict, rejected the testimony of Ms. Dinkins that the defendant appeared to be intoxicated due to ingesting alcohol and a Percocet on the night he shot the victim.  The defendant is not entitled to relief on this issue.

## B.    Tampering with Evidence

The defendant argues the evidence was insufficient to support his conviction for tampering with evidence.  He argues the State failed to prove the defendant concealed the gun because "there is nothing in the record that proves he was aware that an investigation or official proceeding was pending or in progress."  The State contends the evidence was sufficient to show the defendant tampered with evidence by disposing of the murder weapon.

Tennessee Code Annotated section 39-16-503(a)(1) sets forth the following definition of tampering with evidence:

> (a)     It is unlawful for any person, knowing that an investigation or official proceeding is pending or in progress to:
>
> (1)     Alter, destroy, or conceal any record, document or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding[.]

This statute requires the State to prove "timing, action, and intent" beyond a reasonable doubt. *State v. Hawkins,* 406 S.W.3d 121, 132 (Tenn. 2013) (quoting *State v. Gonzales,* 2 P.3d 954, 957 (Utah Ct. App. 2000)). "The 'timing' element requires that the act be done *only after* the defendant forms a belief that an investigation or proceeding 'is pending or in progress.'" *Id.* (emphasis added); *see also State v. Smith,* 436 S.W.3d 751, 763 (Tenn. 2014). "The 'action' element requires alteration, destruction, or concealment." *Hawkins,* 406 S.W.3d at 132. To "conceal" a thing means "to prevent disclosure or recognition of" a thing or "to place [a thing] out of sight." *Id.* (citing *State v. Majors,* 318 S.W.3d 850, 859 (Tenn. 2010)). For "intent" to be established, the proof must show that through his actions, the defendant intended "to hinder the investigation or official proceeding by impairing the record's, document's or thing's 'verity, legibility, or availability as evidence.'" *Id.* (quoting Tenn. Code Ann. § 39-16-503(a)(1)). Tampering with evidence is a "specific intent" crime. *Id.* (internal citations omitted).

The evidence established that after shooting the victim multiple times in front of the victim's friends, the defendant walked out of the hotel carrying the murder weapon. Approximately an hour later, officers located the defendant's vehicle on the side of the road two miles away from the hotel. The defendant was walking near his vehicle; however, the murder weapon was neither on the defendant nor in his vehicle. Upon searching the defendant's vehicle, officers discovered a Smith and Wesson chrome magazine on the right front floorboard with six .40 caliber rounds. Additionally, seven .40 caliber casings were collected at the crime scene. Viewed in the light most favorable to the State, the evidence is sufficient to support the defendant's conviction for tampering with evidence. *See State v. Ellis*, M2020-01451-CCA-R3-CD, 2021 WL 6065321, *6, (Tenn. Crim. App. Dec. 22, 2021) (holding the "[d]efendant knew an investigation into the victim's death was impending or about to take place" after he "shot the victim multiple times, in a public location, in the middle of the day, and in view of multiple witnesses"), *no perm. app. filed*. The defendant is not entitled to relief on this issue.

## IV.     Lesser-Included Offense Jury Instruction

The defendant argues the trial court erred in failing to instruct the jury on voluntary manslaughter as a lesser-included offense to first-degree murder. The State contends the trial court properly determined that an instruction on voluntary manslaughter was not supported by the evidence. The record reflects that the defendant did not file a specific written request for lesser-included offenses of first-degree murder, and the trial court instructed the jury regarding only the lesser-included offense of second-degree murder after ruling the evidence did not support an instruction for voluntary manslaughter.

Upon written request by either party, "the trial judge shall instruct the jury as to the law of each offense specifically identified in the request that is a lesser[-]included offense of the offense charged in the indictment[.]" Tenn. Code Ann. § 40-18-110(a). In determining whether an offense is a lesser-included offense of the charged crime, the trial court should consider the evidence "in the light most favorable to the existence of the lesser-included offense." *State v. Ely*, 48 S.W.3d 710, 722 (Tenn. 2001). In the absence of a written request, a trial court may instruct a jury on a lesser-included offense, but a defense is not entitled an instruction, and the failure of the trial court give an instruction is waived on appeal. Tenn. Code Ann. § 40-18-110(b), (c). However, the issue may be reviewed for plain error. *State v. Page*, 184 S.W.3d 223, 230-31 (Tenn. 2006).

Here, the defendant did not submit a written request to the trial court for an instruction on voluntary manslaughter; therefore, he has waived plenary review of the issue. Additionally, the defendant has failed to establish that he is entitled to plain error relief.

Before an error may be recognized, it "must be 'plain' and it must affect a 'substantial right' of the accused." *State v. Adkisson*, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *State v. Page*, 184 S.W.3d 223, 231 (Tenn. 2006). In *State v. Smith*, our supreme court adopted *Adkisson*'s five-factor test for determining whether an error should be recognized as plain:

(a) The record must clearly establish what occurred in the trial court;

(b) A clear and unequivocal rule of law must have been breached;

(c) A substantial right of the accused must have been adversely affected;

(d) The accused did not waive the issue for tactical reasons; and

(e) Consideration of the error is "necessary to do substantial justice."

24 S.W.3d 274, 282-83 (Tenn. 2000) (quoting *Adkisson*, 899 S.W.2d at 641-42). "[A]ll five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* at 283.

The record shows that the trial court instructed the jury on second-degree murder as a lesser-included offense of first-degree murder. Voluntary manslaughter is a lesser-included offense of first-degree murder. *State v. Sims*, 45 S.W.3d 1, 21 (Tenn. 2001); Tenn. Code Ann. § 40-18-110(g)(2). However, the trial court's failure to instruct the jury on voluntary manslaughter does not rise to the level of plain error because consideration of the issue is not necessary to do substantial justice. Our supreme court has indicated that when a jury receives a sequential instruction as well as an instruction on immediate lesser-included offenses, as was the case here, the omission of additional lesser-included offenses is harmless error. *See State v. Williams*, 977 S.W.2d 101, 106 (Tenn. 1998) (noting that "by finding the defendant guilty of the highest offense to the exclusion of the immediately lesser offense, second[-]degree murder, the jury necessarily rejected all other lesser offenses"). The defendant is not entitled to relief on this issue.

## *Conclusion*

Based on the foregoing authorities and reasoning, the judgments of the trial court are affirmed.

_____
J. ROSS DYER, JUDGE